745 P.2d 102

**STATE of Arizona, Appellee,**

v.

**William Allen PLEW, Jr., Appellant.**

No. CR–86–0373–AP.

Supreme Court of Arizona,
En Banc.

Oct. 29, 1987.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Paul J. McMurdie, Asst. Attys. Gen., Phoenix, for appellee.

Daniel F. Davis, Tucson, for appellant.

FELDMAN, Vice Chief Justice.

William Allen Plew, Jr. was convicted of attempted second degree murder, A.R.S. §§ 13–1001 and –1104, and of aggravated assault, A.R.S. § 13–1204. The state alleged and proved that these offenses were of a dangerous nature and were committed while on parole. The trial judge sentenced defendant to life in prison under A.R.S. § 13–604.01 (now § 13–604.02). Plew appeals, arguing primarily that the trial judge erred in refusing to admit evidence of the effect of the victim's possible cocaine intoxication. We have jurisdiction pursuant to Ariz. Const. art. 6 § 5(3) and A.R.S. §§ 13–4033 and –4035.

## FACTUAL AND PROCEDURAL SUMMARY

William Plew was a cocaine addict. His supplier was Joe Molina. The men took the drug both nasally and intravenously, but with different effects. Cocaine depressed Plew but made Molina hostile and aggressive. Plew was present many times when Molina took cocaine and saw its impact on him. In the late evening of September 19, 1983, Plew went to Molina's house to buy cocaine. Molina had just returned from a

ballpark where he had several beers. He was upset with Plew for previously bartering a broken gun for cocaine. As Plew started home, Molina followed. The men argued outside the house.

They are the only witnesses to what happened next. According to Plew, Molina became increasingly incoherent and abusive. Molina seemed to be on a cocaine high and was boasting incoherently of a prior exploit in which he supposedly arranged the execution of an enemy. He was verbally abusive to Plew, and had a wild look in his eyes. Plew described Molina as "all wired up." He pointed a pistol at Plew, who grabbed the weapon with both hands and held on while Molina wildly kicked and struggled. The gun fired again and again. Molina finally broke away and ran back inside the house. In a panic, Plew dropped the gun and headed for the Mexican border. He went back to Tucson in May 1984 and voluntarily surrendered to the police.

Molina's story is different. According to him, Plew left the house and walked away, and then, without any provocation, drew a pistol and aimed it at Molina, who immediately backed away. Plew began to shoot. The first three bullets knocked Molina down. Plew fired two more shots at the prone Molina and then left. Molina got up, ran into the house and locked the doors. He collapsed by the front door as his girlfriend telephoned for help.

The police arrived within a few minutes. They found three people inside: Molina, his girlfriend and an unidentified male. Molina seemed coherent to the responding officers, although he was bleeding and in obvious pain. After saying "Billy shot me," he refused to say more. The girlfriend gave some details on William Plew and also declined to give more information. On the way to the hospital, Molina told an ambulance attendant that he had taken cocaine before the shooting. The police were unable to find the pistol or any shell casings outside. They did not search inside the house.

Molina had been shot three times in the chest and abdomen, once in the side of the right buttock, and once in the right calf. By the time he reached the hospital emergency room, Molina was unconscious. He had no measurable blood pressure or pulse. On first examining Molina, the treating physician did not specifically observe signs of drug usage. Over the next few weeks, Molina underwent repeated major operations and received over fifty units of blood, amounting to three or four replacements of all the blood in his body.

In January of 1985, the state tried Plew for attempted first degree murder and its lesser-included offenses. The jury convicted him of attempted second degree murder and aggravated assault. When the trial judge concluded that Plew had been in a parole status at the time of the shooting, he sentenced Plew to the mandatory life term. We reversed the conviction in *State v. Plew*, 150 Ariz. 75, 722 P.2d 243 (1986), because the trial judge had incorrectly refused to instruct the jury on self-defense.

The state retried Plew in October of 1986. Since the only eyewitnesses were Plew and Molina, the prosecution relied heavily on inferences from two facts. First, Molina had been shot five times in different spots. Therefore, it was incredible that the shooting could have been self-defense. Second, the police could find no gun or shell casings outside the house. Plew therefore must have used a revolver and run off with it.

Plew maintained that Molina had attacked and was fighting in a wild, drug-induced fury. Thus, because of his cocaine intoxication, Molina was able to continue struggling despite serious injuries and did not even realize that he was wounded until the affray was over. As far as the weapon and any shell casings, Plew asserted that Molina and his cronies had time to secrete those items before the police arrived. In an effort to educate the jury and bolster his theory, Plew proffered the testimony of drug and behavioral expert David Gurland, M.D. Dr. Gurland was to explain the impact of "cocaine intoxication" on the ability of a drug user to think logically, control his aggression, absorb abnormal levels of bodily injury and continue fighting without

feeling the pain. The trial judge excluded this "speculative testimony" because the expert could not unequivocally state the level of Molina's cocaine tolerance or tell just how much, if any, cocaine was really used by Molina on the night of the shooting.

The second jury convicted Plew of attempted second degree murder and aggravated assault. Once again, Plew received a life sentence. Plew has appealed to this court over a change in the manner of making peremptory jury challenges, over the failure to correctly ascertain his parole status as of the date of the shooting, and over the exclusion of the expert testimony. Because a proper resolution of the expert testimony issue is dispositive of this appeal, we do not reach the other two issues.

## DISCUSSION

### Expert Testimony on Behavior and Intoxication

The defendant sought to introduce expert testimony on cocaine intoxication to show why the victim was the aggressor and to explain how the struggle over the gun could have continued despite the shots repeatedly striking the victim. In general, relevant evidence is admissible. Rule 402, Ariz.R.Evid., 17A A.R.S. The initial determination is whether this expert evidence is relevant. Even if relevant, of course, other considerations would have to be met before the trial court would be required to admit such expert evidence.

Courts across the nation have shown an increasing willingness in recent years to allow experts to inform juries in appropriate cases of applicable theories, research and discoveries in the behavioral and physical sciences. In *State v. Chapple*, 135 Ariz. 281, 291, 660 P.2d 1208, 1218 (1983), we held such testimony could be admitted *if relevant* and then adopted four criteria to evaluate such testimony.[1] They are: (1) qualified expert; (2) proper subject; (3) conformity to a generally accepted explan-

atory theory; and (4) probative value compared to prejudicial effect. At trial, no serious question was raised concerning Dr. Gurland's qualifications to discuss the impact and meaning of "cocaine intoxication." We turn, therefore, to examine first whether this topic was relevant and then to consider the three remaining *Chapple* issues.

### A. Relevancy—Purpose of the Offer

The defense attorney made two offers of proof by avowal in order to secure admission of his expert testimony. In the first offer, the attorney stressed Dr. Gurland's expected testimony about the severe impact of cocaine intoxication in engendering false bravery, aggression, loss of emotional control, and irrationality. He wanted to demonstrate how Molina could have been the instigator of the near-fatal fight even though Molina was the smaller and shorter of the two men. The trial judge ruled the evidence inadmissible because of a lack of evidence that Molina was in fact under the influence of cocaine at the time of the shooting and due to a lack of particularized information about the detrimental effects of cocaine on Molina.

Plew's attorney renewed the offer of proof later that trial day. This time he stressed the fact that acute cocaine intoxication could allow a person to absorb tremendous bodily damage and still keep fighting without being conscious of the harm. Given the facts of the case and the theories of the parties, the subject of the testimony is obviously relevant—if believed, it provides an answer to one of the central questions raised by the facts and the prosecution. Of course, evidence of the behavioral characteristics of those who are intoxicated with cocaine still would not be relevant unless the predicate, the victim's cocaine intoxication, were first established by some evidence.

### B. Relevancy—The Predicate

There was testimony that the victim was under the influence of cocaine at the time

---

1. In *Chapple*, we approved the admissibility of expert testimony concerning the reliability and perils of eyewitness identifications. *See* Note, *Expert Testimony on Eyewitness Identification:* *Invading the Province of the Jury?*, 26 ARIZ.L. REV. 399 (1984). *See also* Annot., 46 A.L.R. 4th 1047, 1065–66 (1986) (discussion of *Chapple* ).

of the shooting. Molina admitted that he was a cocaine dealer and a user. According to one of the treating doctors, Molina told an ambulance attendant that he had used cocaine prior to the fight. Plew stated that Molina was abusive, aggressive and incoherent. Plew, an addict himself, had seen Molina react to cocaine intoxication on previous occasions. To Plew, Molina seemed to be on a cocaine high at the time of the altercation. Given the corroborating evidence, we cannot say that Plew's testimony was insufficient, if believed by the jury, to establish that Molina was in a state of cocaine intoxication at the time of the fight. Thus, there was a sufficient predicate for evidence on the effect of cocaine intoxication on behavior. We turn, then, to inquire whether the behavioral evidence conformed to the legal principles regarding expert testimony.

### C. Proper Subject

Expert testimony in the behavioral sciences is admitted to educate and assist the jury in understanding the evidence which will determine the facts in issue. Rule 702, Ariz.R.Evid., 17A A.R.S. If the subject is one of common knowledge, then expert testimony is unnecessary and should not be allowed. State v. Owens, 112 Ariz. 223, 227, 540 P.2d 695, 699 (1975) (physician allowed to testify about the abnormally deep laceration of victim's neck). This is demonstrated by the Arizona law generally excluding expert testimony on the adverse mental and physical effects of alcohol intoxication. See, e.g., State v. Means, 115 Ariz. 502, 566 P.2d 303 (1977) (in first-degree murder case, trial court properly excluded expert testimony on effect of level of alcohol intoxication on ability to form specific intent).[2] In the typical case, it is the defendant trying to show how alcohol impaired his ability to form the intent to commit a crime, see, e.g., State v. Laffoon, 125 Ariz. 484, 610 P.2d 1045 (1980) (trial judge correctly refused to let psychiatrist testify about impact of voluntary intoxication on ability to form specific intent for

second-degree murder), although occasionally a defendant will try to show how alcohol induced a victim to behave in an abnormal fashion. State v. Rivera, 152 Ariz. 507, 733 P.2d 1090 (1987) (trial court properly excluded expert opinion that alcohol intoxication reduced inhibitions of rape victim). The aversion to allowing expert testimony on the effects of alcohol intoxication extends to the most extreme manifestations of chronic alcoholism, such as alcoholic blackouts. State v. Hicks, 133 Ariz. 64, 649 P.2d 267 (1982) (susceptibility to alcoholic blackouts not a character trait provable by expert testimony). In all these cases, admissibility is normally refused because the effect of alcohol intoxication is generally thought to be a matter of common knowledge.

There is considerably less judicial resistance to the introduction of expert testimony when the intoxicant is a drug other than alcohol. An instructive case in this regard is State v. Betancourt, 131 Ariz. 61, 638 P.2d 728 (App.1981). In that case, defendant's sole defense to a robbery charge was lack of specific intent due to voluntary ingestion of the hallucinogenic LSD. The trial judge refused to allow the defendant's medical expert to testify regarding the effect of LSD upon the average human. The defendant was convicted. Holding that the behavioral effect of LSD ingestion was a proper subject of expert testimony, the court of appeals reversed because it did not "believe that the effect of LSD on the human mind is necessarily within the common experience and knowledge of the jury." 131 Ariz. at 62, 638 P.2d at 729. Although the defendant and his friends had testified about the effect of LSD, the court of appeals concluded that the defendant was entitled to the extra credence given to a "supposedly disinterested medical witness." 131 Ariz. at 63, 638 P.2d at 730. Other jurisdictions are similarly inclined to allow expert testimony concerning the effects of nonalcoholic drug intoxication on

---

**2.** But see State v. Franklin, 463 A.2d 749 (Me. 1983) (trial court incorrectly excluded expert testimony about mental and physical manifesta-

tions of continuous alcohol consumption on specific intent to murder).

intent and behavior.[3] This is also true when the intoxication results from the use of a mixture of alcohol and other drugs.[4]

Cocaine use has become a severe social and medical problem in the United States. Cocaine intoxication is the most insidious manifestation of the problem. An overdose of cocaine can easily kill the user by poisoning the brain centers that control breathing, body temperature, blood pressure and heartbeat.[5] The drug affects the mental state of a user as well, often producing a toxic psychosis, including bizarre mental states and abnormal behavior.[6]

A few courts have considered the subject of cocaine intoxication. *See, e.g., State v. Hansen*, 46 Wash.App. 292, 730 P.2d 706 (1986) (psychologist and neuropharmacologist properly allowed to testify about cocaine intoxication's impact on defendant's mental state); and *People v. Parmes*, 114 Misc.2d 503, 451 N.Y.S.2d 1015 (Sup.Ct. Crim.Term 1982) (forensic psychiatrist permitted to testify on effects of cocaine intoxication). In *State v. Dean*, 487 So.2d 709 (La.Ct.App.1986), the defendant insisted that a cocaine-induced psychosis had rendered him incapable of knowing right from wrong when he killed his mother and sister. The trial court permitted a series of

defense and prosecution experts to testify about the symptoms and effects of cocaine intoxication and whether the defendant displayed behavior consistent with that condition when he was taken into custody. 487 So.2d at 713–14.

■ It is our opinion as well that the effect of cocaine intoxication on mental and physical behavior is a proper subject for expert testimony in an appropriate case. We believe this is such a case. An addict is accused of attempting to murder his supplier, also an addict. The defendant claims self-defense—alleging he was trying to protect himself from the attack of an angry, intoxicated "pusher" acting under a cocaine-induced frenzy. One hopes that the behavioral characteristics of such people are not within the experience of the average juror. Here, as in the LSD case, *Betancourt, supra*, behavioral and medical testimony on the subject could be especially useful to the jury in evaluating the evidence, thus hopefully ensuring an informed and dispassionate jury verdict.

### D. Conformity to a Generally Accepted Explanatory Theory

■ The defendant in our case sought to introduce an expert opinion that a person

**3.** *See, e.g., People v. Hayes*, 172 Cal.App.3d 517, 218 Cal.Rptr. 362 (4th Dist.1985) (effect of PCP on ability to form intent); *People v. Free*, 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218 (1983) (relation of PCP use to voluntary intoxication defense), *cert. denied sub nom., Free v. Illinois*, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983); and *Fouts v. State*, 374 So.2d 22 (Fla. Dist.Ct.App.1979) (effect of LSD on mind of escapee), *disapproved on other grounds, Parker v. State*, 408 So.2d 1037 (Fla.1982).

**4.** *See, e.g., Gurganus v. State*, 451 So.2d 817 (Fla.1984) (effect of consumption of Fiorinal capsules and alcohol on ability to form specific intent); *State v. Guzman*, 100 N.M. 756, 676 P.2d 1321 (expert could hypothetically testify about the effect of mixing medication and alcohol on a person with extreme emotional problems), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984); *People v. Cronin*, 60 N.Y.2d 430, 458 N.E.2d 351, 470 N.Y.S.2d 110 (1983) (effect on mental state of consumption of a case of beer, several marijuana cigarettes and five to ten Valium tablets); and *Fitzgerald v. Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982) (jury entitled to expert's hypothetical opinion on cumulative effect of LSD, Tranxene

and alcohol on capacity of defendant to form specific intent), *cert. denied*, 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 469 (1983). *But see State v. Brown*, 345 N.W.2d 233 (Minn.1984) (trial court properly excluded expert testimony on ability of defendant to form specific intent after drinking alcohol and smoking marijuana).

**5.** *See, e.g.*, Smith, et al., *Acute Myocardial Infarction Temporally Related to Cocaine Use; Clinical, Angiographic, and Pathophysiologic Observations*, 107 ANNALS OF INTERNAL MEDICINE 13 (July 1987).

**6.** "Acute cocaine intoxication is similar to amphetamine intoxication. Initially, the drug stimulates the heart rate and blood pressure. Vasoconstriction, hyperpyrexia of up to 40 degrees C (104 degrees F) and mydriasis are also characteristic signs of cocaine abuse. Cardiotoxic effects that can occur with acute cocaine intoxication include arrhythmias, circulatory failure, convulsions, respiratory failure and coma. Toxic psychotic states with associated hallucinations and paranoia can result from large doses of the drug." Giannini, Price & Giannini, *Contemporary Drugs of Abuse*, 33 AM. FAMILY PHYSICIAN 207, 215 (March 1986).

intoxicated with cocaine would be abnormally aggressive, *see, e.g.,* R. ASHLEY, COCAINE: ITS HISTORY, USES AND EFFECTS 153 (1975), and able to sustain severe bodily injury without necessarily feeling the pain. *See, e.g.,* L. GRINSPOON & J. BAKALAR, COCAINE: A DRUG AND ITS SOCIAL EVOLUTION, ch. 5 "The Acute Intoxication" (1976). As intimated earlier, this type of testimony evidently does conform to generally accepted theories explaining the consequences of cocaine intoxication. *See also* J. BAUM, ONE STEP OVER THE LINE: A NO-NONSENSE GUIDE TO RECOGNIZING AND TREATING COCAINE DEPENDENCY, at 63–77 (1985).

E. *Specificity—Application to Defendant*

■ In this case, therefore, expert testimony on cocaine intoxication would be a relevant, proper subject conforming to a generally accepted explanatory theory if presented by a qualified individual. The state argues, however, that defendant's expert should not have been permitted to testify about the effects of cocaine intoxication because the doctor could not state with "reasonable medical certainty" that the victim in fact was intoxicated with cocaine at the time of the shooting. We disagree. Assuming compliance with the basic foundational predicates in this area, an expert may explain by way of general testimony or hypothetical discourse the recognized behavioral impact of the predicate events. *Chapple, supra.* This explication needs to be made with the requisite degree of scientific and medical rigor, but the expert may and often should properly refrain from specifically stating that *this* particular person *must* have acted in *this* precise manner at *this* exact point. *Chapple,* 135 Ariz. at 292, 660 P.2d at 1219. In fact, in many cases the testifying expert may be unable to take that final step due to his or her personal lack of information about the predicate event. *See, e.g., State v. Hallman,* 137 Ariz. 31, 668 P.2d 874 (1983) (expert may testify about character traits of a specific defendant and the possible acts flowing from such traits).

This does not mean, of course, that the expert's testimony is meaningless. It serves the vital function of educating the jury in matters that are relevant in the event they find the existence of the predicate fact from other evidence. Thus, we have allowed expert medical and behavioral testimony to assist in explaining such esoteric topics as the general impact of certain drugs on the average person, *State v. Gretzler,* 126 Ariz. 60, 85, 612 P.2d 1023, 1048 (1980); the general reliability of eyewitness identification, *Chapple,* 135 Ariz. at 297, 660 P.2d at 1224; the fact that many child abuse victims recant their accusations, *State v. Moran,* 151 Ariz. 378, 384, 728 P.2d 248, 254 (1986); and the general characteristics of a victim of battered child syndrome, *State v. Moyer,* 151 Ariz. 253, 255, 727 P.2d 31, 33 (App.1986).

We believe that such testimony is of great assistance to the criminal justice system. It works in some cases to the advantage of a defendant, *see Chapple, supra,* and in other cases to the advantage of the prosecution. *See Moran, supra,* and *State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73 (1986). It works in all cases, we believe, to further the interests of justice, since it aids in the search for truth by providing the jury with information about scientific and sociological advances and discoveries that may assist them in evaluating and understanding the evidence.

F. *Trial Court Discretion*

The state correctly argues that under Rule 104, Ariz.R.Evid., 17A A.R.S., the trial judge had discretion to decide the preliminary question of the sufficiency of the predicate required for the admission of Dr. Gurland's evidence. The state concludes from this that the court's exclusion of Dr. Gurland's testimony can be upheld on the hypothesis that the judge did not believe the evidence Molina's use of cocaine before the shooting was sufficiently credible to establish the predicate needed to submit the issue to the jury. We do not agree. We recently held on a similar issue that such "veracity-reliability-credibility" issues "traditionally fall within the province of the

jury rather than the judge. We do not believe that a judge should be able to bootstrap himself into the jury box via evidentiary rules." *State v. LaGrand (Walter),* 153 Ariz. 21, 28, 734 P.2d 563, 570 (1987). We held that the judge's preliminary inquiry "should be limited to asking whether evidence in the record ... would permit a reasonable person to believe" the evidence on the preliminary questions. *Id.*

While defendant's testimony in the case before us is not the most credible story that has passed before our eyes, a jury could believe it, particularly if the story were reinforced with Dr. Gurland's explication of the effect of cocaine intoxication. In the final analysis, neither defendant, the abuser, nor Molina, the supplier, is such a sterling and unimpeachable character that it could be said as a matter of law that only one version of the affair should go to the jury. If both versions are to be submitted to the jury, then defendant is entitled to the corroborating evidence from Dr. Gurland.

Nor do we believe that the error in refusing the admission of this expert evidence falls within the realm of discretion left to the trial judge. The evidence in question is not collateral but goes to the very heart of the only defense presented by Plew. Without the expert evidence, Plew's explanation for the shooting could easily be seen as preposterous and contradicted by the uncontroverted facts. The proffered evidence, as in *Chapple* and *Betancourt,* is on the key issue and, in fact, the only really controverted issue in the case. Under such circumstances, we view the refusal to admit this evidence as an error of law. *Chapple,* 135 Ariz. at 297, 660 P.2d at 1224.

## G. *Prejudice*

The final question is whether the defendant was unduly prejudiced by the exclusion of the proffered expert testimony. We conclude that he was. The case was close in the sense that only the defendant and victim were witnesses to the actual shooting. The defendant's claim of self-defense hinged on giving some rational explanation of how the victim could have absorbed five shots while maintaining his aggressive assault. There was evidence that the victim was an addict, had used cocaine before the shooting, and was intoxicated with cocaine at that point. An explanation of the effects of cocaine intoxication may have persuaded the jury to decide that guilt was not proved beyond a reasonable doubt. The defendant should have an opportunity to present that testimony to a jury.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion.

GORDON, C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.