802 P.2d 1024

**STATE of Arizona, Appellee,**

v.

**John Patrick ZIMMERMAN, Appellant.**

**No. 1 CA–CR 89–960.**

Court of Appeals of Arizona, Division 1, Department B.

May 8, 1990.

Redesignated as Opinion and Publication Ordered Aug. 28, 1990.

Review Denied Feb. 26, 1991.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Crim. Div., and Joseph T. Maziarz, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Carol A. Carrigan, Deputy Public Defender, Phoenix, for appellant.

## OPINION

JACOBSON, Judge.

The primary issue raised in this appeal from a conviction for first degree murder [1] is whether the trial court properly excluded expert testimony as to a Brain Electrical Activity Mapping (BEAM) performed on defendant's brain.

The defendant, John Patrick Zimmerman, was charged with and convicted of first degree murder and sentenced to life imprisonment. The facts giving rise to this charge are that on the night of April 29, 1987, the defendant went to a party. The victim, Zachary McAlister, was also a guest at the party. The defendant and the victim talked for a while, and later both went motorcycle riding.

Eventually the two motorcycles collided. The defendant got off his motorcycle and attacked the victim with a knife. The victim attempted to flee, but the defendant pursued him and stabbed him repeatedly. Ultimately, the defendant fractured the victim's skull with a rock. Several persons witnessed segments of the struggle, one of whom charged the defendant with his auto-

---

1. This appeal was originally filed in the Arizona Supreme Court which transferred it to this court on August 3, 1989 pursuant to A.R.S. § 12–120.21 (eff. Sept. 15, 1989).

mobile which prevented the defendant from retrieving his motorcycle.

The defendant then went to a nearby house, took off his clothes, except for his shorts, and cleaned himself with water. He took a bicycle and rode to another house, where he rang the doorbell and asked permission to call his parents, saying he had killed someone in self-defense. The residents instead called the police. When Officer William Fisher arrived, the defendant told him "he had killed a guy."

The defendant was arrested after being given his *Miranda* rights. He was again read his rights inside the police car by Officer Fisher. The defendant said that he had fully understood his rights. He told Fisher that after the motorcycle accident, the victim pulled a knife, but he took it away and stabbed the victim several times. Officer Fisher drove the defendant to the crime scene, where he was identified by a witness.

At 12:50 a.m., Detective Russell Davis interviewed defendant, after determining that defendant had been given his rights. The defendant told Davis he fully understood his rights and repeated the story he told to Fisher. As the interview proceeded, the defendant's description of the events grew increasingly bizarre. He described choking sensations and the victim's "red eyes." He changed his story and said that the victim had charged at him, but that it was he, the defendant, who had drawn the knife. He remembered stabbing the victim, pursuing him, and dropping the rock on his head.

At trial there was no claim of self-defense, the sole defense being insanity. Several expert witnesses testified as to this issue. Psychiatrists George O'Connor and Jack Potts, who treated the defendant while he was in jail, opined that defendant was psychotic when they saw him after the incident, but neither could offer an opinion as to defendant's sanity at the time of the murder. Psychiatrist Martin Kassell, who treated the defendant while he was at the Durango facility, testified that defendant was, at the time of the crime, unable to distinguish right from wrong. Psycholo-

gist Joel Glassman and psychiatrist Paul Bindelglas both testified defendant was M'Naghten insane.

Also testifying for the defense was neurologist Dale Schultz. He concluded that defendant had a temporal lobe disorder causing partial epileptic seizures. Dr. Schultz performed an electroencephalogram (EEG) on the defendant in October 1987. This EEG did not reflect any abnormalities, but after conferring with another doctor, a second test was performed in November 1987 which revealed an abnormality in the temporal lobe. Dr. Schultz could not offer an opinion as to defendant's sanity at the time the crime occurred.

The expert witnesses for the state were neurologist Harry Tamm and psychiatrist Alexander Don. Dr. Tamm concluded that defendant did not have an organic brain disorder, and that his activities were inconsistent with temporal lobe epilepsy. Dr. Don testified that defendant had a drug-induced mental disorder, but was legally sane. He also found defendant's activities incompatible with a seizure disorder.

The defendant raises four grounds of error and requests this court to reverse and remand for a new trial.

## TRIAL COURT'S EXCLUSION OF EXPERT TESTIMONY

The first argument raised by the defendant is that the trial court erred in granting the state's motion to exclude expert testimony by Dr. Schultz regarding what is known as a BEAM (Brain Electrical Activity Mapping) study done on defendant's brain. The BEAM neurological imaging system is a computerized method of displaying and interpreting EEG and evoked potential (EP) data obtained from scalp leads. This system produces simple, color-coded topographic maps of the scalp that illustrate the spatial distribution of brain electrical activity. The defendant urges that the state's motion *in limine* was untimely under Rule 16.1(b), and that exclusion of the BEAM precluded him from fully presenting his insanity defense.

First, we agree with the defendant that the motion *in limine* was untimely. In *State v. Rodriguez*, 126 Ariz. 28, 612 P.2d 484 (1980), the Arizona Supreme Court stated: "It is apparent that in criminal cases, a 'motion in limine' is nothing more than a motion to suppress specifically authorized by Rule 16...." *Id.* at 30, 612 P.2d at 486. In *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982), the state urged that defendant's motion to preclude the testimony of persons previously hypnotized was untimely. The court agreed that a motion *in limine* "is treated as a motion to suppress by this Court and must comply with the constraints of Rule 16.1." *Id.* at 182, 644 P.2d at 1268.

Although the motion was untimely, the court was not precluded from considering it. In *State v. Vincent*, 147 Ariz. 6, 708 P.2d 97 (App.1985), Division Two of this court recognized that, if a court has the power to extend the time to file motions, it has the discretion to hear late motions. The court stated:

> The preclusion sanction in Rule 16.1(c) exists in order to insure orderly pretrial procedure in the interests of expeditious judicial administration.... [I]t is a judicial remedy designed to protect judicial interests. Its invocation, therefore, rests in the discretion of the trial court subject to review only for abuse.

*Id.* at 8–9, 708 P.2d at 99–100.

In this case, presentation of the BEAM evidence depended on defense counsel's ability to lay a sufficient foundation. Defendant's counsel acknowledged that the state could have raised a foundational objection to the BEAM evidence during the trial. Moreover, part of the prosecutor's delay in filing the motion *in limine* was due to the defense's untimely disclosure of evidence. The trial court found that it was much better to address the issue of the admissibility of the BEAM evidence before trial, rather than to disrupt proceedings for lengthy foundation determinations during the course of the trial. We cannot say, on this record, that the trial court abused its discretion in not precluding the state's motion *in limine* as untimely. We turn then to whether the court erred in granting the state's motion.

The defendant urges that the testimony was relevant, would have assisted the jury, and is generally accepted by the relevant scientific community. It is this latter assertion which is in dispute.

Arizona courts have held that in order for expert testimony to be admissible, among other things, the expert's views must conform to a generally accepted explanatory theory. *State v. Plew*, 155 Ariz. 44, 46, 745 P.2d 102, 104 (1987). This rule does not require that the explanatory theory have universal acceptance. *State v. Superior Court*, 149 Ariz. 269, 279, 718 P.2d 171, 181 (1986). However, if the validity of a new scientific technique is in controversy in the relevant scientific community or if it is generally regarded as merely experimental, expert testimony based on its validity cannot be admitted into evidence. *State v. Gortarez*, 141 Ariz. 254, 263, 686 P.2d 1224, 1233 (1984).

The relevant scientific community in this case includes, among others, psychiatrists and neurologists. Dr. Tamm, a neurologist on the staff of Good Samaritan Medical Center, St. Joseph's Hospital, Barrow Neurological Institute, and Phoenix Baptist Hospital, testified that most neurologists would "accept it as an interesting research tool, and as an interesting application of computer to EEG. But I don't think that they generally use it on the diagnostic or conduct of diagnostic conclusions from it." He concluded:

> ... What has been done here is that attempt [sic] has been made to apply a technique [,] in which a lot of people obviously have some doubts about [,] to a very specific clinical situation. I don't think we know enough about that technique to be able to do that....
>
> [T]he level of understanding of this technique isn't such that one can say, okay, if I look at this study I know exactly what happened on the night of such and such, three months ago or six years ago, any more than you can do the same thing with a standard EEG.

Dr. Tamm's statements were based, in part, on an article attached as part of Exhibit 52, introduced by defendant for purposes of the hearing held in response to the motion *in limine*. Exhibit 52 includes a statement by the American Electroencephalographic Society on the clinical use of quantitative EEG. The statement notes:

This statement has been prepared because of concerns about the widespread misuse of quantitative EEG techniques in the clinical setting.

Quantitative EEG techniques include frequency analysis, topographic mapping, statistical comparisons to a normal database and other similar computer-based calculations or displays of EEG or evoked potentials. At present the clinical application of quantitative EEG is considered to be limited and adjunctive.

The article further states that when using quantitative EEGs, "it is essential to record for interpretation and retain as a medical record the EEG data obtained according to the American EEG Society Guidelines. At present there is no justification for stand-alone computer based clinical EEG analysis."

Furthermore, an article by Frank H. Duffy, M.D., the "father" of BEAM, concedes:

However, none of the automated methods used for spike detection are superior to human visual analysis, especially in the discrimination of true spikes from artifacts.... The human eye continues to be the 'gold standard' for spike detection.

■ The BEAM does not just take a picture, it enhances and produces a colored, graphic display of the data entered into the computer. While this may make for a more visually-accessible item, it does not affect or analyze the data itself, which comes from an EEG. In other words, BEAM is essentially a way to graphically display the data from the EEG. Despite evidence of BEAM's attributes, there was substantial evidence from which the court could conclude that BEAM is not generally accepted in the neurological community.

The record shows that the trial judge carefully considered the issue of the relevance of the BEAM evidence. The trial judge had reservations about the acceptance of the procedure and the data base on which the computerized interpretations relied. We find no abuse of discretion. *See State v. Marchesano*, 162 Ariz. 308, 316, 783 P.2d 247, 255 (App.1989) (not abuse of discretion for court to exclude "psychiatric autopsy" of dead co-defendant); *State v. McCutcheon*, 162 Ariz. 54, 58, 781 P.2d 31, 35 (1989) (court did not err in rejecting expert testimony on eyewitness identification where there were no peculiar circumstances regarding identification); *State v. Davis*, 154 Ariz. 370, 375, 742 P.2d 1356, 1361 (App.1987) (not error to exclude expert testimony of graphologist regarding appellant's handwriting).

### SURREBUTTAL ARGUMENT

■ Defendant's second argument is that the trial judge abused her discretion in not allowing him surrebuttal argument on the defense of insanity. Defendant urges that, because he bears the burden of proof on insanity, he is entitled to argue last on that issue. We agree with Division Two's opinion in *State v. Turrentine*, 152 Ariz. 61, 730 P.2d 238 (App.1986), which held that it is up to the trial court's discretion whether to allow surrebuttal argument when the defendant bears the burden of proof on insanity. *Id.* at 65, 730 P.2d at 242. Our opinion is bolstered by the fact that, although the primary issue was defendant's sanity, there was a minor, but not insignificant, dispute over the voluntariness of defendant's post-arrest statements. The defendant was questioned immediately following his arrest, despite his professed protestations that he was cold and tired. This peripheral issue of voluntariness, on which the state bore the burden of proof, was all the more reason to deny the defendant's request.

### JURY INSTRUCTION ON CONSEQUENCES OF NOT GUILTY BY REASON OF INSANITY VERDICT

■ Defendant's third argument is that it was error not to inform the jury of the

result of a not guilty by reason of insanity verdict, particularly where the jury had been informed that the death penalty would not be given. Numerous Arizona Supreme Court opinions have held that the jury is not to be informed of the consequences of a verdict of not guilty by reason of insanity. *E.g., State v. McLoughlin,* 133 Ariz. 458, 461–62, 652 P.2d 531, 534–35 (1982). These decisions are binding on this court. *E.g., State v. McShine,* 131 Ariz. 485, 487, 642 P.2d 482, 484 (App.1982).

The fact that the jury was informed that the state was not seeking the death penalty does not affect the analysis of *McLoughlin.*

## SUPPRESSION OF STATEMENTS MADE BY DEFENDANT

The last issue raised is whether the trial court erred in not suppressing incriminating statements made after the defendant allegedly invoked his right to silence. He contends that the invocation was ignored by the police, who continued their interrogation and obtained damaging statements.

It is clear that defendant was twice given his *Miranda* rights by Officer Fisher, first when he initially was arrested and later at the arrest scene after things had calmed down. The defendant agreed to talk each time. Later, in the early morning hours of the following day at the main police station, Detective Davis asked defendant if he wanted to be readvised of his rights, to which defendant responded, "I understand them fully." Questioning continued and defendant continued to respond.

At some point, defendant stated, "That is all I want to say. I am tired." Detective Davis testified that:

I told him that I wanted to go ahead and get his information, get the story over with. I told him when he was given his Miranda Warnings [sic], that he was told then he didn't have to talk to me, and that he could have a lawyer. And I asked him again if he wanted to talk to me.

He said, 'Yes.'

Q. So did you continue to have a conversation with him?

A. I did.

Q. At any point in time did he ever ask then that the conversation terminate?

A. No.

The state argues that, because defense counsel at trial couched his argument in terms of voluntariness, rather than a violation of *Miranda,* this issue has been waived. Our review of the record shows enough overlap in the arguments that we will address the issue.

The key question, as recognized by *State v. Bravo,* 158 Ariz. 364, 762 P.2d 1318 (1988), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989), is whether the suspect's right to cut off questioning has been scrupulously honored. 158 Ariz. at 373, 762 P.2d at 1327. *Bravo,* the case primarily relied on by defendant, is certainly distinguishable from this case. There, defendant said, "Well, I don't wanna answer any more questions." *Id.* at 368, 762 P.2d at 1322. The two officers continued their interrogation, despite the fact the defendant again asserted that he wanted no more questions. *Id.*

By contrast, defendant here made a rather ambiguous statement. It was unclear whether he did not want to answer any more questions, period, or whether he was just tired and would answer questions after a break. Officer Davis reminded defendant of his rights, told him that it was his preference that they get the questions over with, and then asked if defendant would continue. Defendant responded, "Yes." There is nothing in the record to compel the conclusion that Officer Davis would not have honored defendant's right to cut off questioning, if that was what defendant wanted.

Other cases bear on this issue. In *State v. Carter,* 145 Ariz. 101, 700 P.2d 488 (1985), the defendant initially told the interviewing police that he "didn't want to say anything." *Id.* at 107, 700 P.2d at 494. The reason the defendant did not want to say anything was because he claimed not to know what the officers were talking about. He never expressed a decision to

terminate the questioning, but continued to protest his innocence. *Id.* at 107–08, 700 P.2d at 494–95. The Arizona Supreme Court held that the police did not violate the defendant's *Miranda* rights. *Id.* at 108, 700 P.2d at 495.

In *State v. Lundstrom,* 157 Ariz. 485, 759 P.2d 631 (App.1988), *vacated on other grounds,* 161 Ariz. 141, 776 P.2d 1067 (1989), defendant declared, "[I] can't talk now," and started sobbing. After an interval, the police proceeded, but only after the defendant indicated that he understood his rights and wished the interview to proceed. 157 Ariz. at 486, 759 P.2d at 632. This court found that defendant had waived his right to remain silent. *Id.* at 487, 759 P.2d at 633. *See also State v. Hicks,* 133 Ariz. 64, 74, 649 P.2d 267, 277 (1982).

■ The defendant raises a related argument. He says that his counsel should have been allowed to question Officer Davis about the officer's understanding of the effect of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) on the termination of questioning when a suspect asks for an attorney. We disagree. There was no invocation of right to counsel in this case, and the officer's understanding of the case law is completely immaterial. *See Young v. Environmental Air Products, Inc.,* 136 Ariz. 206, 210, 665 P.2d 88, 92 (App.1982), *aff'd in relevant part,* 136 Ariz. 158, 665 P.2d 40 (1983). The trial court did not err by sustaining the state's objection.

Pursuant to A.R.S. § 13-4035, we have searched the record for fundamental error, and have found none. For the above reasons, the conviction and sentence are affirmed.

VOSS, P.J., concurs.

KLEINSCHMIDT, Judge, dissenting.

I concur with the majority opinion in part; however, I respectfully dissent from that portion of the opinion concerning defendant's request for surrebuttal closing argument on the issue of insanity.

Along with the United States Supreme Court, our supreme court has recognized that shifting to the defendant the burden of proving his defense of insanity withstands constitutional challenge. *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); *State v. Fletcher,* 149 Ariz. 187, 717 P.2d 866 (1986). In Arizona, a criminal defendant who raises the defense of insanity is obligated to prove his assertion of insanity by clear and convincing evidence. A.R.S. § 13-502(B).

Our trial courts have the discretion to alter the order of proceedings during a criminal trial. Rule 19.1, Arizona Rules of Criminal Procedure, 17 A.R.S. In this case, the sole dispute was over his mental state. Consequently, the argument in favor of adhering to the trial proceedings established in Rule 19.1, that the prosecution must prove each element of the crime beyond a reasonable doubt, is a fiction. The only party with a substantive burden of proof in this case was the defendant.

Consequently, under the facts of this case, I do not find *State v. Turrentine,* 152 Ariz. 61, 730 P.2d 238 (App.1986) dispositive, and I would hold that the trial judge abused her discretion when she denied defendant's request to make a surrebuttal closing argument on the issue of insanity.