649 P.2d 267

**STATE of Arizona, Appellee,**

v.

**Ernest Floyd HICKS, Appellant.**

**No. 5121.**

Supreme Court of Arizona,
En Banc.

July 16, 1982.

66

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

Richard Oseran, Pima County Public Defender by Barry J. Baker Sipe, Asst. Public Defender, Tucson, for appellant.

HOLOHAN, Chief Justice.

Appellant, Ernest Floyd Hicks, was convicted after trial by a jury of first degree murder. Appellant was sentenced to life imprisonment. This court has jurisdiction of this appeal pursuant to A.R.S. § 13–4031. We affirm.

The essential facts are that the appellant and the victim had both been drinking at the Club 37, a bar in Tucson. Both men were regular patrons of the tavern. At about 11:00 P.M. appellant left the bar and went outside. The bartender, seeing that appellant had left his coat, called after him. Appellant said he would return shortly for his coat.

A few minutes later, the victim left the bar. Mrs. Hatfield and Mrs. Cox, also bar patrons, left a few minutes after the victim's departure. As the women reached their car, they heard the sound of a shot and watched a man walk from the victim's dump truck carrying a long-barreled gun to appellant's car. The man put the gun in the open trunk, closed it and drove away.

The women alerted the occupants of the bar who found the victim in his truck, slumped forward in the driver's seat with a gunshot wound in the back of his head behind his left ear. The police were notified and appellant was arrested several minutes later at the nearby trailer of a friend, Cathy Barrow.

Appellant raises six issues on appeal:

(1) Did the police employ an unlawful procedure by producing appellant for identification at a one-man show-up?

(2) Should evidence of the victim's good character have been excluded?

(3) Did the introduction into evidence of two photographs of the victim constitute error?

(4) Did a witness' reference to appellant's "known fingerprints" amount to reversible error?

(5) Was appellant denied a fair trial by the preclusion of expert testimony concerning alcoholic black-outs?

(6) Was appellant denied his constitutional rights by the introduction of a statement he made while intoxicated?

## SHOW–UP IDENTIFICATION

Following his arrest, appellant was returned to the parking lot of Club 37. The two witnesses were brought individually to the squad car where appellant was being held. Police officers asked the witnesses to view the appellant to see whether he was the man they saw about an hour earlier walking from the victim's truck with a gun. One witness positively identified appellant as the man in the bar and the man with the gun in the parking lot. The other witness was unsure if he was the same man seen in the parking lot.

Appellant challenged the show-up procedure in a pretrial motion below and now raises the issue on appeal. The trial court denied the motion to suppress identification on the basis that no improper police conduct had been shown.

Recent cases have consistently held that a one-man show-up at the scene of the crime or near the time of the criminal act is permissible police procedure. *State v. Nelson*, 129 Ariz. 582, 633 P.2d 391 (1981); *State v. Kelly*, 123 Ariz. 24, 597 P.2d 177 (1979). Although suggestiveness is inherent in a one-man show-up, a show-up identi-

fication is admissible if the identification is reliable. *State v. Tresize*, 127 Ariz. 571, 623 P.2d 1 (1980); *State v. Trujillo*, 120 Ariz. 527, 587 P.2d 246 (1978).

The factors used to determine whether an identification is reliable were adopted from *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *State v. Tresize, supra; State v. Trujillo, supra.* They are: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the confrontation.

■ The identifying witness had ample opportunity to view the man with the gun as he walked from the victim's truck, placed the shotgun in the trunk of a car and looked around before getting in the car. The parking lot was well lit. The witness stated that her attention had been drawn to the man by the sound of the shot, and she was intent upon watching him leave. The witness testified that she positively recognized the man with the gun to be the same man she had seen inside the Club 37 minutes before. She was positive in her identification of appellant in the squad car. The show-up confrontation occurred only about an hour after the crime and in the same place that the observations were originally made. In the totality of the circumstances, we find that the identification was reliable. There was no error in the trial court's refusal to suppress the evidence obtained at the show-up identification shortly after the murder.

## EVIDENCE OF VICTIM'S CHARACTER

The appellant claims that there was error in the admission of evidence showing the peacefulness of the victim. The state argues that objection to the evidence was waived and the defense raised the issue initially.

Defense counsel did remark to the jury in his opening statement that:

Cathy Barrow knew [the victim], had had problems with him in the past. He was a loudmouth. She characterized him as obnoxious, a cutting-type person.

The prosecution apparently sought to anticipate a defense of self-defense. The prosecutor asked four witnesses, all patrons or employees of the Club 37, whether the witnesses had ever seen the victim quarrel or engage in physical violence with anyone at the bar. Defense counsel allowed all but the third inquiry to pass without objection, and his relevancy objection to the third inquiry was overruled. All of the witnesses testified that they had never seen the victim become physically violent, and only one witness had seen him argue with people in the bar.

The defense counsel's objection to the testimony of the third witness concerning the character of the victim should have been sustained. Rule 404(a), Rules of Evidence, 17A A.R.S. sets forth the limited circumstances when the character of the victim is relevant. It provides in part:

Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(2) *Character of Victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

■ In the instant case, the defense had introduced no evidence of the victim's character for the state to rebut. Whatever the defense counsel had in mind by the reference to the victim's nature was never developed in the defense case. We do not believe this remark opened the door for the state to present evidence on the issue. The defense did not follow up with any evidence tending to support the remark in the opening statement. Self-defense was not raised at trial and there was no evidence that the victim was the first aggressor. We therefore hold

that it was error to permit the prosecution to present evidence of the victim's peaceful character.

■■ The state urged that the defense waived its objection because on cross-examination, defense counsel asked the fourth witness whether she had ever seen the victim *or* the defendant fight or argue with anyone at the bar. The state contends that this question waived the previous objection. We disagree. Once an objection has been made and overruled, defense counsel must attempt as best he can to minimize any harm that might flow from the erroneous admission of unfavorable evidence. To do so by asking a question concerning the objected-to evidence does not thereby waive the objection. *See State v. Noble*, 126 Ariz. 41, 612 P.2d 497 (1980); *State v. Ellerson*, 125 Ariz. 249, 609 P.2d 64 (1980).

■ Although the testimony was irrelevant and should have been excluded pursuant to rule 404(a), we do not believe that any prejudice to appellant resulted from admission of the testimony. The first two witnesses who testified on the issue did so without objection, so the evidence came before the jury in the first instance without defense objection. We do not believe that the additional evidence from the later witnesses caused any prejudice. In fact, defense counsel used the questioned evidence to appellant's advantage during closing argument. The state's argument, on the other hand, made no reference to the testimony. Furthermore, the testimony was not such that it was likely to evoke sympathy from the jurors.

■ Appellant challenges, on the same ground, the admission, over objection, of testimony by a homicide detective on redirect examination that he "found no evidence that anyone had a serious beef or anything with [the victim]." This statement followed vigorous cross-examination of the detective which elicited that no motive on the part of the appellant could be found. The prime thrust of appellant's defense was that somebody else killed the victim. Under these circumstances, the state could offer evidence in rebuttal to show that no motive for anyone else to kill the victim was uncovered. *See State v. Hawkins*, 260 N.W.2d 150 (Minn.1977); *Kelly v. Commonwealth*, 259 Ky. 770, 83 S.W.2d 489 (1935).

### PHOTOGRAPHS

■ Appellant asserts that two color photographs of the victim's injury were improperly admitted in evidence because they were so gruesome as to inflame the passions of the jury. The first picture showed the victim as he was found in his truck, slumped forward with the gunshot wound behind his ear. The second picture, taken during the autopsy, is a close-up of the entry wound with a ruler laid next to it to show the size and shape. Neither picture is particularly bloody nor gruesome, and in our opinion, they were not so inflammatory as to prejudice the average person.

■ The trial court has broad discretion to admit or exclude arguably gruesome photographs. *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315 (1981). Inflammatory photographs that have probative value are admissible, *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980), *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980), as long as the probative value is not substantially outweighed by the potential to prejudice the jury. *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981). Admission is proper where the photograph aids the jury in understanding the testimony or shows the location of the mortal wounds. *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981).

Here, the pictures were relevant to the issue of premeditation. They illustrated how the victim was shot from behind at close range while seated normally in his truck. The pictures were helpful to the jury in understanding expert testimony about the distance of the barrel of the shotgun from the victim's head, the angle of entry, and the peculiar configuration of the wound. The trial court expressly found that the probative value of these two photographs outweighed any possible prejudice. We note that the trial court excluded nu-

merous other photographs it found to be cumulative or more likely to arouse the passions of the jury. The trial court exercised its discretion in a sound and proper manner.

## REFERENCE TO KNOWN FINGERPRINTS

During defense counsel's cross-examination of the police identification technician the following exchange took place:

Q. You found this particular print in your dusting?

A. Yes, sir.

Q. And you compared it, I think, to the fingerprints that you obtained from Mr. Hicks after he had been arrested; is that correct?

A. No, sir. I believe it was just known prints.

Q. Okay. So you compared it and you found that the print on the truck of [the victim's] vehicle [sic] did not match the print that you had of Mr. Hicks; is that right?

[DEFENSE COUNSEL]: I would like to reserve a legal matter, if I may, for later.

THE COURT: Certainly.

Defense counsel moved for a mistrial on the ground that the response he elicited from the officer allowed the jury to infer that Hicks had a criminal record. The trial court denied the motion reasoning that there are many common contexts other than criminality in which a person's fingerprints may be recorded, such as military service or employment matters. Hicks asserts that the trial court's ruling was reversible error. We cannot agree.

 Although the general rule is that evidence which shows that the defendant may have committed other crimes is inadmissible, *State v. Thompson*, 126 Ariz. 3, 612 P.2d 54 (1980), we do not find the testimony that the latent prints were compared to appellant's "known prints", without more, to be indicative of a prior criminal record. The record does not disclose whether the "known prints" were in fact obtained as the result of an arrest.

Appellant would have us equate evidence of "known prints" with "mug shot" evidence which we have previously held to be error because of the prejudicial effect it could have on the jury. *State v. Kelly*, 111 Ariz. 181, 526 P.2d 720 (1974), *cert. denied*, 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975); *State v. Cross*, 123 Ariz. 494, 600 P.2d 1126 (App.1979). This we refuse to do because of the fundamental difference between "mug shots" and "known prints". The term "mug shot" is synonymous with post-arrest picture, whereas fingerprints, as the trial judge observed, may be "known" for a number of reasons not associated with criminality. Here, the jury was made aware that appellant had been in the Air Force. No mention was made of any prior arrest except that appellant himself told the jury that he thought he had been arrested for "another D.W.I." It is reasonable to assume that the "known prints" were not obtained because of any prior criminal conduct on the part of appellant other than that he disclosed himself. Therefore we find no error. *See State v. McGuire*, 113 Ariz. 372, 555 P.2d 330 (1976); *State v. Finn*, 111 Ariz. 271, 528 P.2d 615 (1974).

Furthermore, the testimony was responsive and initiated by defense counsel's questioning; thus any error, had there been any, might well be considered invited and not grounds for reversal. *State v. Lawrence*, 123 Ariz. 301, 599 P.2d 754 (1979); *State v. Stoneman*, 115 Ariz. 594, 566 P.2d 1340 (1977).

## EXPERT TESTIMONY

Appellant challenges the ruling of the trial court which precluded the defense from offering psychiatric testimony concerning the effect of alcohol on the defendant's state of mind.

The legislature has established the parameters for the use of evidence of a defendant's voluntary intoxication. A.R.S. § 13–503 provides:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in

such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

We have previously held that the effect of alcohol intoxication is an area within the common knowledge and experience of the jury, and therefore, no expert testimony is needed to assist the trier of fact. *State v. Laffoon*, 125 Ariz. 484, 610 P.2d 1045 (1980); *State v. Means*, 115 Ariz. 502, 566 P.2d 303 (1977). Thus, it is proper for a trial court to preclude psychiatric testimony relating to the effect of alcohol upon the ability to form specific intent. *Id.*

Appellant would have us find that *Laffoon* does not control where the intoxication is related to chronic alcoholism and there is evidence that the accused may have suffered a black-out at the time of the crime. Instead, appellant asserts that susceptibility to alcoholic black-outs is a character trait making relevant psychiatric testimony admissible under *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981).

*Christensen* allows expert testimony only where it assists the trier of fact to recognize a character trait of the particular defendant. Such testimony may only be used as evidence that the defendant possesses such a trait and it must be left to the jury to determine whether and how the trait affected the defendant's specific intent at the time of the alleged crime.

In the instant case, expert testimony would add nothing to the existing evidence that appellant might have had an alcoholic black-out at the time of the shooting. Appellant had a blood alcohol level of .26 percent three or four hours after the shooting. Witnesses testified to having seen him drink large amounts of alcohol on the day and night in question. He testified that he had been a chronic alcoholic for many years. No expert is needed to establish that appellant may have had an alcoholic black-out on the night of the shooting. Indeed, the psychiatrists themselves base their opinions that a black-out is possible on appellant's professed inability to remember anything of the night.

Our examination of the psychiatrists' reports reveals only that the experts concluded that appellant's ability to form specific intent may have been impaired. A.R.S. § 13–503 does as much. None of the psychiatrists stated that alcoholic black-outs preclude premeditation of an intent to kill. Given the statutory directive of A.R.S. § 13–503, all that remains is a fact question for the jury: was appellant's mental state less than intentional, or were his acts less than premeditated at the time of the shooting, by reason of his severe intoxication. The jury must decide this question in the same way a psychiatrist would have to decide it; that is, by looking at the facts surrounding the shooting. The record contains ample evidence from which the jury, which was properly instructed, could have found that appellant acted with premeditation and with the intent to kill notwithstanding his inability to remember so doing.

We hold that *State v. Laffoon, supra*, is controlling and the trial court properly denied appellant's very general request for psychiatric proof on the issue of alcoholic black-outs as it relates to specific intent under Arizona law.

Appellant claims that federal constitutional guarantees mandate admission of psychiatric testimony which negates specific intent. That argument was considered and rejected in *Wahrlich v. State of Arizona*, 479 F.2d 1137 (9th Cir. 1973), *cert. denied*, 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973) where the court stated:

Among the considerations that we have taken into account in refusing to accept Wahrlich's argument are these: (1) in the interest of harmonious federal-state relations, federal courts should not unnecessarily interfere with the state's trial of criminal cases; (2) courts should be extremely reluctant to constitutionalize rules of evidence; (3) the state of the

72

developing art of psychiatry is such that we are not convinced that psychiatric testimony directed to a retrospective analysis of the subtle gradations of specific intent has enough probative value to compel its admission.

*Id.* at 1138. The *Wahrlich* court also deemed the effect of intoxicants upon state of mind to be part of common human experience which factfinders can understand and apply without expert assistance.

## APPELLANT'S STATEMENT

Prior to trial appellant filed a motion to suppress the statement he made to police officers on the night of the shooting. A voluntariness hearing was held in which the trial court heard the evidence concerning the taking of appellant's statement. Included in the evidence presented to the trial court were two tape cassettes used to record the interrogation between the defendant and the police. The tapes were played in their entirety at the hearing so the trial judge could hear what actually occurred at the interview with the defendant.

After hearing the evidence, the trial court denied the motion to suppress, expressly finding that in spite of appellant's intoxication, his statement was voluntary and he knowingly and intelligently waived his constitutional rights.

Appellant alleges error on two grounds. First, he claims that his intoxication rendered him incompetent to validly waive his constitutional rights. Secondly, appellant contends that the police interrogation involved violated the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 It is a denial of due process to admit an incriminatory statement into evidence that is involuntary by reason of extreme intoxication. *State v. Porter*, 122 Ariz. 453, 595 P.2d 998 (1979). Proof that the accused was intoxicated at the time he made the statement will not, without more, prevent the admission of his statement. Before such a statement will be held to be inadmissible, it must be shown that the accused was intoxicated to such an extent that he was unable to understand the meaning of his comments. *State v. Laffoon*, 125 Ariz. 484, 610 P.2d 1045 (1980); *State v. Porter, supra; State v. Clark*, 102 Ariz. 550, 434 P.2d 636 (1967). Of course, the jury may consider intoxication in determining whether the statements are true or false. *State v. Laffoon, supra.*

 Appellant had a .26 percent blood alcohol level just after the interrogation. The rather high level of alcohol in his system is not, by itself, determinative. We have previously held that certain confessions made while the accused had a high blood alcohol level were admissible. *State v. Magby*, 113 Ariz. 345, 554 P.2d 1272 (1976) (.26 percent blood alcohol); *State v. Clark, supra* (.38 percent blood alcohol). Blood alcohol level is just one factor to consider in the totality of the circumstances. Appellant had suffered from chronic alcoholism for over 20 years. The record before us contains the testimony of an expert witness to the effect that an alcoholic develops "a greater capacity . . . to tolerate greater and greater amounts" of alcohol. Therefore, we need not assume that a blood alcohol level of .26 percent would affect appellant the same way it would a less practiced drinker.

In the course of the interrogation, appellant expressed his perceptions about his own state of intoxication. That portion of the statement reads:

Q. How intoxicated are you tonight?

A. Not that God damn intoxicated.

Q. Could you tell me what do you mean by that? Just clarify it to me what you mean by that statement?

A. I know I'm talking to you but my hands are sticky. You got a tape recorder here. You got a white shirt with blue stripes. You got a blue jacket with maroon lining. He have a police uniform. There's a circle here, there's a box here. A light switch over there. You wanta know anymore?

Q. So what you're saying is you're pretty sober?

A. I think I am, yes.

Q. You think you're sober enough to drive?

A. I know I'm sober enough to drive.

Q. So right now if you were out driving around the car you wouldn't feel like you were drunk driving?

A. No, I won't say that either. What I'm saying . . . is that without you people around, I can get home. But if I got stopped, yes, I think I would be stopped for drunken driving. But I live close enough to the 37 Club, that normally I don't worry about it.

Q. OK, would you . . . So in other words you consider yourself pretty much in control of your coordination?

A. Yeah, I . . . I . . . I consider myself pretty much in control of my facilities [*sic*].

The above exchange is indicative of appellant's ability to understand his statements. He was able to draw a distinction between what the police consider to be "drunk driving" and what he considers to be "drunk driving." He was aware of his surroundings, cooperative, and responsive to questioning in an appropriate manner. We note that appellant had some difficulty answering certain questions; for example, he could not remember his address and at one point he confused his name with that of the victim. Nonetheless, appellant's understanding of the meaning as well as the importance of his answers is illustrated by a consideration of the matters presented in his complete statement.

 A trial court's ruling on a motion to suppress will not be disturbed on appeal absent clear and manifest error. *State v. Smith*, 123 Ariz. 231, 599 P.2d 187 (1979). Considering the totality of the facts and circumstances, we find no such error.

Appellant next contends that his statement should have been suppressed as taken in violation of his so-called *Miranda* rights. In particular, appellant claims that his right to remain silent was not honored because the interrogation continued after he had expressed a desire to invoke his fifth amendment right. The complained-of portion of the statement is as follows:

Q. Now we've got some people that saw it happen, OK?

A. I'm gonna tell you something and I'm gonna tell you one time and one time only. I'm a small son-of-a-bitch. But I don't shoot nobody. You either accept it or you reject it. And that's that, I ain't gonna go no farther. I ain't saying a fucking word from now on. It's as simple as that. I don't have to shoot nobody. I got too God damn many friends. I got too many friends that beat the . . . I got friends that beat JERRY'S [the victim's] ass in a minute. I don't have to worry about JERRY. I don't like him. But I don't dislike him enough to kill him. Now, you can accept this or you can reject it. And I have no scruples about it. You can believe me or you can disbelieve me, it's up . . . it's up to you. And personally I could care less. Now it's up to you guys. I have no further words to say. No . . . I won't even say that. Now you want . . . you . . . you wanta nail me? Go ahead, it's cool. I wanna go . . . I have no reason to kill nobody. If I got a reason, you'll never find out about it, I'll tell you that right now. This I can guarantee. If I have reason to killing anybody, you'll never find out. Now, you wanta talk to me?

Q. I'll talk to you, you said you don't wanta talk to me anymore.

A. Or you want . . . you want . . . you wanta believe me or you wanta nail me?

Q. I want to talk to you.

A. No, you wanta nail me.

Q. It's up to you. You don't have to talk to me.

A. What you wanta do is you wanta nail me, right?

Q. I want to get your side of the story and find out what your involvement is in this situation?

A. I don't like JERRY. I . . . I . . . I'll tell you the truth. I don't like this dude. Him and me's coming in so God damn . . . But that don't mean I'm gonna kill him.

Q. Do you want to keep talking about this or not?

A. What did I kill him with?

Q. I'm asking you a question, do you want to keep talking about it or not?

A. I'm gonna tell you something. I own a 32–20. It's an antique. I hang on to this God damn gun because it's worth a thousand bucks in the street. It's worth a thousand bucks. Now if I shot him with that . . . if he got killed with a 32–20, well, apparently I did it. But if he got killed with anything else, I didn't do it. But I own a 32–20. It's not registered which I don't know if they have to be registered or . . . if it's a state law or not. But I own a 32–20. It's an antique. That's the only God damn reason I ain't hanging on to that son-of-a-bitch is because I was offered a thousand bucks the othe[r] day for that God damn 32–20. And I'm waiting for . . . for 1500, I'm going 1500 and then I'll take it. Other than that, you can kiss my ass when it comes to that God damn gun. Now you wanta go .. go and confiscate my gun?

Q. Where is it?

A. I ain't saying shit.

Q. Do you want me to ask you some more questions or you want me not to ask you anymore questions?

A. Go ahead, ax [*sic*] me more questions.

 It is generally true that if an individual undergoing custodial interrogation indicates that he wishes to remain silent, the interrogation must cease. *Miranda v. Arizona, supra.* Once an individual has invoked his right to silence, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The admissibility of statements obtained after the individual in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

 The record shows that the interrogating detective did scrupulously honor appellant's right to remain silent. The detective merely attempted to ascertain whether appellant intended to invoke his right to remain silent. In so doing the interrogator made it clear that it was entirely appellant's choice whether he wished to continue and that he had no obligation to speak. Appellant's conduct shows no intention to invoke his right to remain silent. His incessant rambling in the face of the detective's express willingness to terminate the interrogation shows that appellant retained the right to cut off questioning, and merely chose not to exercise it. The questioning that follows the excerpted portion of appellant's statement was initiated by appellant himself. This is not a case where the police failed to honor a decision of a person to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in efforts to force him to change his mind. Rather, this is a case where appellant did not clearly invoke his right to remain silent, but instead himself initiated further interrogation. *Miranda* does not require the police to force an accused to remain silent or to turn a deaf ear toward an accused who insists upon talking. We hold that the trial court did not err in admitting appellant's statement.

The judgment of conviction and sentence is affirmed.

GORDON, V. C. J., and HAYS, CAMERON and FELDMAN, JJ., concur.