921 P.2d 197

STATE of Idaho, Plaintiff–Respondent,

v.

Ismael RIVAS, Defendant–Appellant.

No. 21753.

Court of Appeals of Idaho.

July 1, 1996.

Service, Gasser & Kerl, Pocatello, for appellant. Steven V. Richert, argued.

Alan G. Lance, Attorney General; Catherine O. Derden, Deputy Attorney General, argued, Boise, for respondent.

WALTERS, Chief Judge.

Ismael Rivas appeals from his judgment of conviction for principal to voluntary manslaughter, I.C. § 18–4006(1). He also appeals from an order of the district court denying his motion to be sentenced as a juvenile under the Youth Rehabilitation Act. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 8, 1994, Rivas, who was sixteen years old, and Santiago Espinoza, who was fourteen years old, drove with Jeff Breiner and Ivan Pine from Pocatello to American Falls. The four visited Pine's friends, Brandy Dalton, Mundi Wilson and Dianna Castaneda, at the England Apartments. At approximately 10:30 p.m., Rivas and Espinoza decided to leave the England Apartments and go "cruising" in Breiner's car. As they left, Breiner threw a knife to Rivas "for self-protection." Espinoza was already armed with a knife.

On the same evening, Joseph Blair and Patrick Caldwell, both teenagers, had gone out to throw eggs at cars and buildings. According to Blair, Caldwell hit a car with an egg and both boys then split up and ran. Blair went home, but Caldwell eventually showed up near the car Rivas and Espinoza were planning to drive.

In a written statement that Rivas gave to the police and that was read to the jury, Rivas stated that he and Espinoza approached Breiner's car and saw Caldwell and another male, the latter of whom was trying to "open the car or something," while Caldwell was "looking out" for him. As Rivas

and Espinoza approached, the male who had been trying to get into the car ran behind the apartment building. Rivas further stated that he and Espinoza were about to leave when Caldwell said something to Espinoza. Rivas could not hear what was said because the car's engine was running. Espinoza asked Caldwell if he had a problem. Caldwell replied, "Leave me alone because I'm buzzing." Espinoza then walked up to Caldwell and Caldwell hit Espinoza, who started hitting him back. Rivas then put his head down on the steering wheel because he "couldn't believe this was happening." He looked again and saw Espinoza stabbing Caldwell. Rivas stayed still for a couple minutes because he was afraid. He then "got the guts to go over there and stop the fight." He walked over to the two other boys and "got in between both of them on the [ground]." He "tried to stop [Espinoza] from hitting [Caldwell] but he didn't listen." Rivas then pushed Espinoza away, whereupon Caldwell hit Rivas. Rivas then "lost [his] temper and hit [Caldwell] three to four times somewhere on his body. As [he] was hitting [Caldwell], [Espinoza] started stabbing [Caldwell] again." Rivas then "got up off the [ground] to get [Espinoza] in the car to get him away from [Caldwell]."

Espinoza and Rivas then returned to the England Apartments. According to Breiner, Espinoza's hands were bleeding. Espinoza told Wilson and Castaneda that he stabbed himself in the hand while attempting to stab Caldwell. In a taped interview, Rivas stated that he washed the knife that Espinoza had used. Wilson testified that she saw Rivas put the knife under the carpet. A short time later, Dalton and Castaneda took two knives from under the carpet and dropped them in a dumpster behind the American Falls City Police Department, from which they were subsequently recovered.

Caldwell received seventeen stab wounds to his torso, front shoulders, the right side of his face and the left side of his upper body. He was taken to Harms Memorial Hospital in American Falls, where he died.

Rivas was originally charged with principal to first degree murder and as an accessory after the fact to first degree murder. The

information was subsequently amended to charge second degree murder. On August 24, 1994, a jury found Rivas guilty of principal to voluntary manslaughter. The district court conducted a hearing to determine if Rivas should be sentenced under the Youth Rehabilitation Act. The court determined that the Act should be waived, and Rivas was sentenced as an adult. The court then imposed a unified sentence of fifteen years, with a minimum period of confinement of five years.

On appeal, Rivas argues that the district court erred by: (1) failing to instruct the jury on the lesser included offense of involuntary manslaughter; (2) defining voluntary manslaughter in the jury instructions as an unlawful killing without malice; (3) misapplying I.R.E. 404 in allowing evidence of the nonaggressive nature of the victim; and (4) waiving jurisdiction under the Youth Rehabilitation Act for sentencing purposes. Rivas further asserts that the evidence was insufficient to support his conviction as a principal for aiding and abetting voluntary manslaughter.

## II. ANALYSIS

### A. The Lesser Included Charge of Involuntary Manslaughter.

Rivas first contends that the district court erred in failing to instruct the jury, *sua sponte,* on the lesser included charge of involuntary manslaughter. The question of whether the jury was properly instructed is a question of law over which this Court exercises free review. *State v. Tomes,* 118 Idaho 952, 956, 801 P.2d 1303, 1307 (Ct.App.1990).

At the close of trial, the jury was instructed on the offense of second degree murder and the included offenses of principal to voluntary manslaughter and of battery. Rivas acknowledges that he never requested that the jury be instructed on the included offense of involuntary manslaughter. However, he argues on appeal that the court nonetheless has an obligation to instruct the jury on all lesser included offenses which reasonably can be supported by the evidence and that not providing the jury instruction constituted fundamental error. In support of this proposition, Rivas cites *State v. Atwood,*

105 Idaho 315, 318, 669 P.2d 204, 207 (Ct. App.1983), in which this Court quoted the following language from I.C. § 19–2132(b) as it then existed: "The court shall instruct the jury on lesser included offenses when they are supported by any reasonable view of the evidence." However, as the state points out, *Atwood* was decided before I.C. § 19–2132(b) was amended in 1988. The statute currently provides:

(b) The court shall instruct the jury with respect to a lesser included offense if:

(1) Either party requests such an instruction; and

(2) There is a reasonable view of the evidence presented in the case that would support a finding that the defendant committed such lesser included offense but did not commit the greater offense.

Thus, the 1988 amendment of the statute requires an affirmative request for a jury instruction on an included offense. *See State v. Eastman,* 122 Idaho 87, 90, 831 P.2d 555, 558 (1992); *State v. Kluss,* 125 Idaho 14, 24, 867 P.2d 247, 257 (Ct.App.1993) ("[W]here there was no request for such an instruction, and the court had no reason to believe that such instruction was desired by [the defendant] or appropriate under existing law, there was no error. *A fortiori,* there was no fundamental error.").

Accordingly, we hold that because Rivas did not request the instruction on involuntary manslaughter as a lesser included offense, the district court did not err in failing to so instruct the jury.

### B. The Instruction for Voluntary Manslaughter.

Rivas next asserts that the district court improperly instructed the jury on voluntary manslaughter. Rivas concedes that he did not object to instruction no. 12, the instruction on voluntary manslaughter, at trial. Failure to object to an instruction in a criminal case does not constitute waiver of the right to raise the instruction as an issue on appeal. *State v. Smith,* 117 Idaho 225, 228, 786 P.2d 1127, 1130 (1990). However, the record reflects that Rivas not only failed

to object, but in fact, requested the instruction.

■ Where a defendant's "affirmation of correctness [of a jury instruction] goes well beyond a mere failure to object to the instruction," the defendant cannot "invoke the *Smith* decision to enable [the defendant] to argue contrary to the position [he or] she affirmatively presented to the trial court." *State v. Wilkerson,* 121 Idaho 345, 349, 824 P.2d 920, 924 (Ct.App.1992). In such a situation, any error regarding the district court's instruction is invited and this Court will not consider the claim of error on appeal. *Id.* As stated by our Supreme Court in *State v. Owsley:*

> In criminal cases, a defendant may not consciously invite district court actions, and then successfully claim these actions are erroneous on appeal. Nor may a criminal defendant successfully allege error in a ruling of the court, when the defendant himself requested the ruling.

105 Idaho 836, 837, 673 P.2d 436, 437 (1983) (citations omitted).

Assuming, without deciding, that the instruction was error, we hold that because the instruction was specifically requested by Rivas, any error was invited and will therefore not be considered by this Court on appeal.

## C. Sufficiency of the Evidence for Aiding and Abetting Voluntary Manslaughter.

■ Rivas argues that there was insufficient evidence to support his conviction for aiding and abetting voluntary manslaughter. The applicable standard of review of sufficiency of the evidence is whether there was substantial evidence upon which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Reyes,* 121 Idaho 570, 572, 826 P.2d 919, 921 (Ct.App.1992). In making this review, the appellate court will not substitute its view for that of the jury as to the credibility of witnesses, the weight to be given to the testimony, or the reasonable inferences to be drawn from the evidence. *State v. Knutson,* 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct.App.1991). All evidence is considered in the light most favorable to the state. *Id.*

■ Voluntary manslaughter is the unlawful killing of a human being, without malice, upon a sudden quarrel or heat of passion. I.C. § 18–4006(1); *State v. Grube,* 126 Idaho 377, 883 P.2d 1069 (1994). All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, are principals in any crime so committed. I.C. § 18–204. Aiding and abetting requires some proof that the accused either participated in or assisted, encouraged, solicited, or counseled the crime. *State v. Randles,* 117 Idaho 344, 347, 787 P.2d 1152, 1155 (1990).

In support of his contention that there was insufficient evidence to support the conviction for voluntary manslaughter, Rivas emphasizes the following comment by the state in closing argument: "We don't feel we can prove beyond a reasonable doubt that Ismael Rivas intended Mr. Caldwell to die or that Santiago Espinoza intended Pat Caldwell to die." However, Rivas takes this statement out of context. The prosecutor made this statement while in the course of persuading the jury of the proof presented to show Rivas was guilty, as charged, of second degree murder. The argument addressed malice as an element of second degree murder, describing the difference between express and implied malice and explaining that the state would not attempt to prove express malice, but, rather, implied malice. The prosecuting attorney stated:

> Instruction No. 16 says, and I quote, "Malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take the life of a fellow creature."
>
> The state does not maintain that there was an express malice situation here. We don't feel we can prove beyond a reasonable doubt that Ismael Rivas intended Mr. Caldwell to die or that Santiago Espinoza intended Pat Caldwell to die. What the state maintains and what we feel the evidence proves to your satisfaction and beyond a reasonable doubt is that those two fellows engaged in conduct which was inherently dangerous to human life, and then

we start talking about the implied version of malice, malice aforethought. . . .

Therefore, while the prosecutor's explanation of implied malice was rather poorly worded, his statement, in context, was not a concession with regard to proof of voluntary manslaughter, because malice is not an element of voluntary manslaughter as defined by I.C. § 18–4006(1).

Moreover, in determining whether substantial evidence supported the jury's verdict, what is significant is the evidence presented at trial, and not the attorneys's representations of that evidence in their closing arguments. Therefore, regardless of the prosecutor's statement, we examine only the evidence presented at trial in analyzing whether the jury's verdict is supported by the evidence.

As described earlier, Rivas admitted in his written statement that he punched Caldwell while Espinoza stabbed him. Moreover, there was also "some evidence" (*Randles, supra*) to support the state's theory that Rivas held Caldwell while Espinoza stabbed him. In both the taped interview and the subsequent written statement, Rivas reported that Espinoza and Caldwell were already on the ground when he became involved, that when he approached them the two were fighting and Espinoza was stabbing Caldwell. Rivas further stated that Caldwell, while still on the ground, struck Rivas.

However, Rivas's assertion that he did not become involved until Caldwell and Espinoza were already on the ground was contradicted by one of the state's witnesses, Jorge Portillo. Portillo, a resident of the England Apartments, testified that on the night of the murder, he was awakened by some noise outside in the gravel. When he looked out of his window, he saw what he thought were two men standing and wrestling. However, he soon realized that three men were involved because one man fell to the ground, and two other men, one shorter and one taller, were left standing. After the man fell to the ground, the two standing men did not wrestle, but the shorter of the two (whom the state identified as Espinoza) went to the man on the ground and punched him a few times and then kicked him approximately five times. The two standing men then got into a car and drove away.

The jury could have drawn the inference that Rivas was holding Caldwell up while Espinoza stabbed him, based upon Portillo's testimony and the testimony of Dr. Charles Garrison, the forensic pathologist who examined Caldwell's body. Garrison testified that Caldwell had seventeen stab wounds in his body, with the fatal wound on his upper chest. Caldwell also had a split tongue and multiple abrasions and bruises, particularly over his face, forehead, hands and mouth. Yet with all of these wounds, Garrison testified that Caldwell had only one defensive wound, and that was to his hand. Garrison explained that a defensive wound is usually a wound incurred when someone is trying to fend off an instrument that is being wielded at them. He stated that in most incidents involving knives a person will put his hands up in an attempt to defend himself from the knife as it comes at him. The victim then receives slices on his hands or fingers, which are indicative of defending himself against the knife. Garrison testified that he found it unusual in this case, with the number of wounds Caldwell had, that he had only one defensive wound. Garrison stated, "I would expect him to have more if he were able to put his hands up and defend himself against those."

Based on the testimony of Portillo and Garrison, the jury could have inferred that Caldwell was not able to put his hands up to defend himself because he was being restrained by Rivas. Accordingly, we conclude there was substantial evidence upon which a reasonable trier of fact could find that Rivas was guilty of aiding and abetting Espinoza in killing Caldwell, and that each of the elements of voluntary manslaughter was proved beyond a reasonable doubt.

### D. Admissibility of the Victim's Reputation for Peacefulness.

During the state's case-in-chief, the district court allowed the prosecution, over Rivas's objection, to present the testimony of two witnesses regarding Caldwell's reputation for peacefulness. Cliff Hart, assistant principal

at American Falls High School, testified that he knew Caldwell "pretty well." He further testified as follows:

Q. This is a yes or no question. Did Pat Caldwell have a reputation within the community of American Falls High School itself one way or the other for peacefulness?

A. Yes.

Q. And what was that reputation, sir?

A. Well, he was kind of a laid back kid, liked to party. We met on occasions because of that, truancies and stuff.

Q. Did he have a reputation for being peaceful?

A. Yes.

Q. What about the community at large, the community of American Falls at large, did he have that same sort of reputation in the community at large?

A. Yes, he did, as peaceful.

[Q.] Thank you very much.

Patrick Charlton, principal at American Falls High School, testified that he was "fairly well acquainted with" Caldwell. He then testified, in pertinent part:

Q. Sir, were you present when Mr. Hart testified?

A. Yes, I was.

Q. If I asked you the same questions that I asked him, would you give the same answers?

A. Yes.

Q. In other words, both in the community of American Falls and the community of American Falls High School, Pat Caldwell had a reputation for peacefulness?

A. Yes, he did.

[Q]. Thank you, sir.

■ Rivas argues that the district court committed reversible error in admitting evidence of the Caldwell's reputation for peacefulness under I.R.E. 404 because Rivas did not submit any evidence of Caldwell's aggressive nature. Rule 404(a) states, in relevant part:

Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformi-

ty therewith on a particular occasion, except:

\*    \*    \*    \*    \*    \*

(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, *or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the aggressor. . . .*

(Emphasis added).

The state argues that the testimony regarding Caldwell's reputation for peacefulness was admissible under Rule 404(a) because the prosecutor previously had introduced into evidence several statements given to the police by Rivas. In these statements, Rivas made the assertion that Caldwell initiated the confrontation by first making derogatory remarks to Espinoza and then striking Espinoza. Rivas further stated that when he tried to break up the fight, the victim hit him, and that it was only after being hit by the victim that Rivas began punching him. The state asserts that even though it, and not Rivas, introduced the evidence regarding whether Caldwell was the initial aggressor, the evidence was still Rivas's statement and, therefore, the district court properly admitted the testimony regarding the Caldwell's peaceful character.

Rivas argues that because it was the state, and not he, who introduced evidence that the victim was the initial aggressor, the district court violated Rule 404(a) in admitting the testimony regarding the victim's peaceful character. He contends that if testimony regarding the victim's peaceful character is allowed to be introduced in this manner, "the State could get around [Rule 404(a)] simply by putting on testimony or evidence in every case involving potential self-defense justification, and then allow[ing] itself to rebut the evidence it presented."

■ We agree with Rivas's interpretation of Rule 404(a). Although Rule 404(a) provides that evidence of the victim's peaceful character may be offered by the prosecution

"to rebut evidence that the victim was the first aggressor," without explicitly stating that the evidence that the victim was the first aggressor must be *introduced by the defense,* we hold that Rivas's interpretation is implicit in the language of Rule 404(a). Although not previously addressed by our courts, this issue has been decided in other jurisdictions. For example, in *State v. Weinberger,* 204 Mont. 278, 665 P.2d 202, 216–17 (1983), the Montana Supreme Court stated:

> Character evidence of a victim's peaceful nature may be admitted by the prosecution to rebut evidence that the victim was the first aggressor. Rule 404(a)(2) Mont. R.Evid. Here, the prosecution introduced the evidence through the first witness in its case-in-chief before the defendant had introduced evidence that the victim was the first aggressor. Where the *defense raises the issue of self-defense* through cross-examination that tends to demonstrate that the victim was the first aggressor, nothing precludes the State from rebutting that argument in its case-in-chief with evidence of the victim's peaceful nature. However, the State should not introduce evidence of the victim's peaceful nature in anticipation of such an argument.

(Emphasis added).

In *State v. Hicks,* 133 Ariz. 64, 649 P.2d 267 (1982), the appellant asserted that the trial court erred by admitting evidence about the peacefulness of the victim. The state argued that the defense initially raised the issue in his opening statement by conveying one witness's characterization of the victim as a "loudmouth" and an "obnoxious," "cutting-type" person. *Id.* 649 P.2d at 271. At trial, the prosecution had "apparently sought to anticipate a defense of self-defense," and, in its case-in-chief, had elicited testimony from four witnesses that they had never seen the victim become physically violent. *Id.* On appeal, the Arizona Supreme court held that admission of the testimony constituted error because "the defense had introduced no evidence of the victim's character for the state to rebut." *Id.* The court further stated:

> Whatever the defense counsel had in mind by the reference to the victim's nature was never developed in the defense case. We do not believe this remark opened the door for the state to present evidence on the issue. The defense did not follow up with any evidence tending to support the remark in the opening statement. Self-defense was not raised at trial and there was no evidence that the victim was the first aggressor. We therefore hold that it was error to permit the prosecution to present evidence of the victim's peaceful character.

*Id.* 649 P.2d at 271–72. *See also* C. McCormick et al., MCCORMICK ON EVIDENCE § 193 at 821 (4th ed. 1992) ("[T]he last clause of Rule 404(a)(2) provides that whenever *the accused claims self-defense and offers any type of evidence that the deceased was the first aggressor,* the government may reply with evidence of the peaceable character of the deceased.") (original emphasis deleted; emphasis added).[1]

Based on the foregoing, we conclude that the district court erred in admitting the testimony regarding Caldwell's reputation for peacefulness where Rivas had not introduced a theory of self-defense or presented any evidence that Caldwell was the aggressor. However, having thus concluded, we must next determine whether such error was harmless.

In determining whether an error is harmless, the core inquiry is whether it appears from the record that the event said to represent error contributed to the verdict,

---

1. Rivas also relies on *State v. Young,* 106 Idaho 142, 676 P.2d 56 (Ct.App.1984). In that case, the state presented a taped statement in which the defendant made allegations regarding the murder victim's conduct and character. *Id.* at 143, 676 P.2d at 57. The state was then permitted to introduce testimony by two witnesses regarding the victim's reputation for modesty. *Id.* On appeal, the defendant argued that the district court erred in permitting the testimony regarding the victim's reputation for modesty because "the state, not he, opened the door by playing the tape." *Id.* The state argued that door was opened by Young's assertion about the victim's conduct. *Id.* This Court stated: "In general, we note that the state cannot introduce evidence of a victim's good character unless and until the defendant has "opened the door" by first presenting evidence of the victim's bad character." *Id.* We held, however, that the error, if any, in allowing introduction of the evidence was harmless.

leaving the appellate court with a reasonable doubt that the jury would have reached the same result had the event not occurred. *State v. Parkinson,* 128 Idaho 29, 37, 909 P.2d 647, 655 (Ct.App.1996). *See also, State v. Young,* 106 Idaho 142, 144, 676 P.2d 56, 58 (Ct.App.1984).

Our review of the record convinces us beyond a reasonable doubt that the jury would have reached the same conclusion had the evidence at issue not been admitted. The testimony regarding Caldwell's reputation for peacefulness was short, unemphatic and, in fact, somewhat unflattering. Indeed, Hart's testimony regarding Caldwell's being "laid back" was made in conjunction with his testimony that Caldwell liked to "party" and that he had a reputation for truancy. Moreover, the state had previously introduced, through Rivas's statements, evidence that Caldwell was the initial aggressor and that Caldwell had told Espinoza that he was "buzzing." The state also introduced evidence that prior to the murder, Caldwell and Blair had been engaged in throwing eggs at cars, including a police car. Therefore, the testimony regarding Caldwell's reputation for peacefulness was, if not undermined, at least tempered by other evidence regarding Caldwell's character. Further, the testimony was insignificant in comparison to the evidence connecting Rivas to the crime.

We conclude that although the admission of evidence regarding Caldwell's reputation for peacefulness was error, the introduction of that evidence was harmless under the circumstances of this case.

### E. The Youth Rehabilitation Act.

Rivas argues that the district court erred in waiving jurisdiction under the Youth Rehabilitation Act (YRA) and sentencing Rivas as an adult. An order waiving juvenile jurisdiction is reviewed under the abuse of discretion standard. *Zamora v. State,* 123 Idaho 192, 194, 846 P.2d 194, 196 (1992). The determination of how much weight to be given each factor is discretionary with the court, and the decision to waive

YRA jurisdiction can be based on any one factor or any combination of the factors. I.C. § 16–1806(8)(g) [2]; *State v. Christensen,* 100 Idaho 631, 633, 603 P.2d 586, 588 (1979).

Rivas was tried as an adult on a charge of second degree murder, one of the enumerated offenses under the automatic waiver provisions of the YRA, codified as I.C. § 16–1806A(1). However, when the jury found Rivas guilty as a principal to voluntary manslaughter, he once again fell under the jurisdiction of the YRA because voluntary manslaughter is not one of the enumerated violent crimes in I.C. § 16–1806A(1) for which juvenile jurisdiction is automatically waived.

Pursuant to the provisions of I.C. §§ 16–1806 and –1807, and *State v. Larios,* 125 Idaho 727, 874 P.2d 538 (1994), the district court held a hearing to determine if juvenile jurisdiction should be waived for purposes of sentencing. At the conclusion of the hearing, the court made specific findings of fact and conclusions of law. The court then entered an order waiving juvenile jurisdiction. Rivas was sentenced as an adult and given a unified sentence of fifteen years with a minimum period of confinement of five years.

Rivas asserts that in its findings of fact and conclusions of law, the district court unduly attributed Espinoza's conduct to Rivas. In particular, Rivas focuses on paragraphs six, seven and twelve of the court's conclusions of law. Paragraphs six and seven state that the "serious nature of the offense of manslaughter," and the "aggressive, extremely violent, and willful nature of the offense" for which Rivas was convicted were "accorded significant weight" as factors to be considered under I.C. § 16–1806(8)(a) for waiving YRA jurisdiction. Paragraph twelve states:

> 12. This Court concludes, after considering its findings of fact outlined above, its assignment of weight to each, and the factors enumerated in [I.C. § ] 16–1806(8), along with the discretion afforded by this

---

**2.** This statute has since been amended, effective October 1, 1995. *See* 1995 Idaho Sess. Laws, ch. 47, § 1, p. 111.

Court by [I.C. § ] 16–1806(g), that society and the defendant will best be served by waiving [YRA] jurisdiction pursuant to [I.C. § ] 16–1806.

Rivas suggests that because it was Espinoza, and not he, who actually stabbed Caldwell, the district court, in considering the "serious," "aggressive, extremely violent and willful" nature of the offense improperly attributed Espinoza's acts to Rivas. Such an interpretation unjustifiably downplays Rivas's involvement in the crime and ignores the fact that Rivas was convicted of aiding and abetting Espinoza in fatally stabbing Caldwell by either holding Caldwell while Espinoza stabbed him, or by punching him while Espinoza continued to stab him.

There is nothing in the district court's findings to support Rivas's assertion that Espinoza's conduct was imputed to Rivas. We hold that the court properly considered the factors set forth in I.C. § 16–1806 and did not abuse its discretion in waiving YRA jurisdiction and sentencing Rivas as an adult.

### III. CONCLUSION

We hold that the district court did not err in failing to instruct the jury on the included offense of involuntary manslaughter where Rivas did not request such an instruction. Additionally, we decline to review Rivas's assertion that the instruction regarding voluntary manslaughter was error because Rivas requested the instruction. We further conclude that there was sufficient evidence to support Rivas's conviction for aiding and abetting voluntary manslaughter. We also hold that admission of the testimony regarding Caldwell's reputation for peacefulness, although error, was harmless, and that the court did not abuse its discretion in sentencing Rivas as an adult.

Accordingly, Rivas's judgment of conviction and unified fifteen-year sentence for voluntary manslaughter is affirmed.

LANSING and PERRY, JJ., concur.